UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH MCGUNIGLE,<br>      Plaintiff<br><br>V.<br><br>CITY OF QUINCY,<br>PAUL KEENAN, in his Individual and<br>Official Capacities,<br>JOHN DOUGAN, in his Individual and<br>Official Capacities, and<br>      Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

### PARTIES

1. The Plaintiff, Joseph McGunigle, is an individual residing in Quincy, Norfolk County, Commonwealth of Massachusetts.

2. The Defendant, City of Quincy, is municipality located in Norfolk County, Commonwealth of Massachusetts.

3. The Defendant, Paul Keenan, is employed as Chief of Police of the Quincy Police Department, with a place of business located in Norfolk County, Commonwealth of Massachusetts.

4. The Defendant, John Dougan, is employed as a Captain in the Quincy Police Department, with a place of business located in Norfolk County, Commonwealth of Massachusetts.

### FACTS

5. On or about September 28, 2006, the Plaintiff and his wife, Dianne McGunigle, purchased a single family home at 45 Post Island Road in Quincy, Massachusetts. Prior to moving to Post Island Road, the Plaintiff and his family lived in the Merrymount section of Quincy, Massachusetts for over twenty-three (23) years without a single neighbor complaint against them.

6. Soon after moving into their new home, the Plaintiff and his wife began observing rampant and widespread violations of City dog leash laws. Neighborhood residents often allowed their dogs to roam the neighborhood and nearby beach without leashes, frequently leaving dog feces on residents' yards, in the street, and on the beach. It was clearly apparent that

the City dog ordinances were not being enforced by the City of Quincy.

7. On or about November 2006, neighbor Kevin Gracey and his dog were in front of the Plaintiff's house with the dog unleashed and defecating. The Plaintiff went outside and gave Mr. Gracey a bag and advised him that he was in violation of the City dog ordinances.

8. On or about December 2006, the Plaintiff requested that the City install a Mutt Mitt box with dog bags near the beach for dog owners in the area.

9. On or about December 2006, Mr. Gracey's unleashed dog chased and struck the Plaintiff while he was jogging. The Plaintiff again verbally advised him of the City dog leash law.

10. On January 3, 2007, Mr. Gracey's unleashed dog attacked the Plaintiff's three month old puppy. A police report was subsequently filed by Quincy Police Officer Paul Murphy after the incident was reported by the Plaintiff's wife. In response, Mr. Gracey stated to the Plaintiff "we do things differently down here."

11. On January 8, 2007, the Quincy Animal Control Officer mailed letters to all residents of Post Island Road regarding the relevant dog ordinances. Attached hereto as **Exhibit A**.

12. On or about March 2007, Mr. Gracey's dog attacked a mother holding her three month old child. This incident caused a public outcry, and a local hearing was subsequently held at the Quincy Police Station regarding the incident. At this hearing, Mr. Gracey and several of his supporters testified, claiming that Mr. Gracey's dog was "never" off its leash. The Plaintiff had video evidence to the contrary, showing Mr. Gracey's dog off the leash and defecating on the beach.

13. On April 5, 2007, the Plaintiff went to Defendant Dougan and Lieutenant Jack Sullivan with video to prove that that the testimony provided at the hearing was false. Defendant Dougan and Lieutenant Sullivan were dismissive of the Plaintiff's proof that the witnesses were lying. Instead, they told the Plaintiff next time to just "throw the dog shit back in their yard." They then told the Plaintiff to "get out of [their] office." In response, the Plaintiff stated that perhaps the media would be interested in the story. Lieutenant Sullivan replied "I'll give you $100 if they wrote a story on this."

14. On or about April 6, 2007, Animal Control Officer Don Conboy visited the Post Island Road neighborhood and witnessed three dogs off their leashes without owners. One of the owners was Plaintiff's neighbor Ms. Michelle Webber, who subsequently submitted a civilian complaint against the Plaintiff on July 30, 2011 alleging "threats." Based on the Plaintiff's initial complaints about the ordinance violations, Officer Conboy spoke to multiple owners, including Ms. Webber, about the infractions.

15. During the months that followed, the dog ordinance violations continued despite multiple reports by the Plaintiff to the Animal Control Officer. The Plaintiff and his wife also attempted to contact their City Councilor Leo Kelly, who did not return their calls.

16. On or about May 2007, a neighbor left a threatening message on Officer Conboy's voicemail regarding a dog citation he received. The following work day, Officer Conboy noticed one of his tires on the city dog truck was punctured and flat. The same neighbor had been seen at the Quincy dog pound on the previous day. The Plaintiff was assigned to that sector of the City of Quincy, and filed a criminal complaint against the neighbor for unlawful threats to Officer Conboy.

17. Following months of numerous failed attempts to raise awareness of the violations amongst City leaders and officials, the Plaintiff sent a number of citations to dog owners violating the City law.

18. On May 24, 2007, the Plaintiff was called into the Chief's office without Union representation. Then-Chief Crowley, then-Captain Defendant Keenan and Defendant Dougan harshly criticized the Plaintiff for writing the citations. Defendant Keenan told the Plaintiff that he was "violating the neighbors rights and harassing them" by issuing the citations.

19. That same day, Chief Crowley unlawfully ordered the Plaintiff to immediately cease issuing citations regarding the dog ordinance violations.

20. On or about late-May 2007, the Quincy Police Patrol Officers' Association filed a grievance on the unlawful order issued by Chief Crowley.

21. Shortly thereafter, the Plaintiff spoke with Officer Conboy, who told him the Chief's Office issued a directive concerning the Plaintiff. Officer Conboy was told that "if and when the McGunigle's call you about any dog offenses in their neighborhood, you call us first before you do anything."

22. During this time period, the Plaintiff made multiple calls to Officer Conboy to complain of the ongoing violations, yet they were never acted upon.

23. On or about June 2007, Dianne McGunigle wrote two letters to then-Chief Robert Crowley about the dog problem, copies of which were cc'd to then-Mayor William Phelen and Councilor Kelly. The letters received no response from the City or the other recipients.

24. On or about June 2007, the Plaintiff was informed by Quincy Police Lieutenant Brian Tobin to set up a neighborhood meeting regarding the dog ordinance issue, but "not to take any involvement." Lt. Tobin also stated to the Plaintiff that "Councilor Kelly wants nothing to do with it."

25. On or about June 2007, the Plaintiff requested that the Conservation Commission send documents to a neighbor explaining that the neighbor doesn't own the beach behind his house on which he was letting his dog defecate.

26. On or about June 2007, the Plaintiff had a civil issue with neighbor regarding property line issues. Despite the civil nature of the matter, the Chief had police supervisors respond and file an official police report on the matter. The Plaintiff is unaware of any other officer living in

Quincy who has been exposed to similar protocol.

27. On or about August 2007, the Plaintiff and his wife spoke directly to Mayor Phelan, who told the McGunigles to "let it go."

28. After approximately three months of non-responsiveness and inaction from the City and/or the Department, the Plaintiff began issuing dog ordinance citations again.

29. As a result of the Plaintiff issuing the dog ordinance citations, the Chief suspended the Plaintiff for five days on September 12, 2007. The Plaintiff subsequently appealed the suspension on the grounds that the Chief's order was unlawful.

30. On September 15, 2007, Channel 7 News aired two live segments on the Post Island Dog incidents. Attached hereto as **Exhibit B**. The news segment highlighted the fact that the Quincy Police Department clearly took the side of the neighbors against the Plaintiff in the dispute. The reporter stated that "Quincy's Police Chief sided with the neighbors, suspending Officer McGunigle without pay for five days."

31. On September 23, 2007, a Boston Globe article was published outlining the highly controversial and politicized public dispute surrounding the Post Island Road dog ordinance issue. Attached hereto as **Exhibit C**. The Boston Globe article was generally positive in favor of the Plaintiff, and highlighted the failures of the Quincy Police Department and its hierarchy, including the Defendants, to enforce the City ordinance uniformly.

32. Both the Boston Globe article and the Channel 7 report angered the Defendants over their handling of the Post Island dog dispute, as evidenced by the subsequent litany of retaliatory acts and disparate treatment against the Plaintiff.

33. On March 27, 2008, Chief Crowley suspended the Plaintiff for five days regarding an neighbor's complaint against the Plaintiff. The Plaintiff subsequently met with City Solicitor James Timins, who guaranteed that, in lieu of the Plaintiff contesting the issue, when the Chief retired on July 2, 2009, the suspension will "go away."

34. On or about January 2009, Defendant Dougan told Union representative Peter Curley, "if he [Plaintiff] doesn't watch himself, he's gonna get canned. Tell them [Plaintiff and his wife] to call the State [State Police]. We're not getting involved down there."

35. On February 22, 2009, the Plaintiff prevailed on his arbitration appeal stemming from the September 12, 2007 suspension. The arbitration award vacated the suspension and found that the Chief's order to not issue citations was unlawful. Attached hereto as **Exhibit D**.

36. Following the Plaintiff's arbitration victory, the ongoing retaliatory acts and disparate treatment continued to be taken against the Plaintiff by the Quincy Police Department administration, including the Defendants.

37. In July 2009, Defendant Kennan was sworn in as Chief of Police. Despite the previous

agreement with City Solicitor Timins, Defendant Keenan demanded that the Plaintiff accept a two day suspension for the neighbor's complaint. After the Plaintiff refused to accept the altered agreement, Mayor Koch intervened against Defendant Keenan and a Memorandum of Agreement was signed to revoke the Plaintiff's entire suspension.

38. Defendant Keenan continued to manifest his animosity toward the Plaintiff through a pattern of subsequent retaliatory conduct, including, but not limited to, numerous attempts to release disparaging information to the media, unwarranted discipline, refusal of FMLA time, unjustified and illegal psychological evaluations, attempts to terminate plaintiff's employment, and disparate treatment.

39. After he assumed the role of Chief of Police, Defendant Keenan met with multiple neighbors to discuss their concerns regarding the dog ordinance dispute. Defendant Keenan subsequently promised the Plaintiff's wife a meeting to hear her side of the controversy, which he later cancelled.

40. On July 13, 2009, the Plaintiff utilized accrued sick days for a family emergency.

41. As a result of the Plaintiff's use of his sick time, Defendant Keenan ordered the Plaintiff to surrender his service weapon and radio, and without lawful basis, ordered the Plaintiff to undergo a psychiatric fitness evaluation thirty (30) days later with Michael Rater, M.D. on August 11, 2009. The normal timeframe within the Department for such evaluations was to visit a doctor within two to three days.

42. During the entire time he was waiting for the psychiatric evaluation, the Plaintiff was unable to work overtime or details.

43. On August 11, 2009, Dr. Rater showed the Plaintiff ninety-six (96) pages of a "secret" ongoing investigation conducted by Defendant Keenan on the Plaintiff regarding neighborhood issues.

44. During this time period, the Plaintiff's personal doctor, Richard Black, M.D., authored two letters to Defendant Keenan and Dr. Rater regarding the Plaintiff's fitness for duty. Defendant Keenan refused to respond or acknowledge the letters.

45. On September 8, 2009, the Plaintiff was finally cleared to return to duty in a report by Dr. Rater. Dr. Rater, who was hired by the City, found the Plaintiff to be fit for duty.

46. On January 21, 2010, the Plaintiff's wife suffered a massive heart attack. The type of heart attack she suffered is nicknamed "the widow maker" because of the incredibly low survival rates. Dianne McGunigle survived, albeit with the requirement that she be under constant daily care. The Plaintiff accordingly applied for leave under the Family Medical Leave Act ("FMLA"), and was subsequently approved despite a sustained dispute from the City and the Department regarding the application. In comparison, the Plaintiff is aware of at least one Quincy Police Officer who has submitted an FMLA application and been told by the Chief's secretary that she herself would approve it.

47.     Despite being on FMLA leave, on or about April 16, 2010, the Chief's Office contacted the Plaintiff and ordered him back to work. The Plaintiff came to work after this call because he was in fear of job reprisal. They falsely told the Plaintiff that his FMLA time had expired, despite not yet taking the amount of time to which he was entitled.

48.     During this time period, Defendant Dougan changed the Plaintiff's accrued leave schedule to reflect that days taken for FMLA qualifying reasons was instead categorized as unapproved "sick days." Typically, the Department gave employees the option to use sick, vacation, or personal days. Defendant Keenan told the Plaintiff's union that he wasn't going to correct the sick days, and for them to file a grievance.

49.     Later, the Plaintiff was told by Defendant Dougan, "if you call in sick Friday to take your wife to the Doctor, I will be forced to take disciplinary action against you."

50.     The Plaintiff suffered, and has continued to suffer, harassment, retaliatory acts, and disparate treatment as a result of the exercise of his First Amendment rights throughout the Post Island Road dog ordinance dispute.

51.     On July 30, 2011, the Plaintiff retrieved National Grid property (six National Grid cones) after National Grid had recently been working on the road. The cones were located on the road near neighbor Ms. Webber's property line, and had apparently been placed there by Ms. Webber despite clearly belonging to National Grid. Ms. Webber, whom the Plaintiff had previously cited for multiple dog ordinance violations, made a complaint to the Chief's office against the Plaintiff.

52.     Despite the relative innocuous nature of this incident, Defendant Keenan suspended the Plaintiff for five days and requested that Mayor Thomas Koch "fire" the Plaintiff. Mayor Koch is Defendant Keenan's brother in-law.

53.     Defendant Keenan charged the Plaintiff with improper evidence handling, untruthfulness and a breach of personal conduct. Following a full evidentiary hearing, the City's outside hearing officer, Mr. George Lane, did not sustain the untruthfulness or improper evidence handling charges.

54.     Despite the exoneration on the untruthfulness charge, Defendant Keenan still insinuated in a March 12, 2012 Patriot Ledger article that the Plaintiff was untruthful. He stated "His [Plaintiff's] version differed considerably from all of the eyewitness versions. Untruthfulness for a police officer is a serious infraction." Attached hereto as **Exhibit E**.

55.     At some point during the disciplinary hearing regarding the National Grid cones, Defendant Dougan told a Union representative "Don't represent McGunigle, let it go."

56.     In an October 2011 correspondence to Mayor Koch, Defendant Keenan misleadingly noted that Plaintiff has several "sustained" suspensions in his folder with fifty-four complaints from thirty-two citations. The correspondence failed to note the multiple "sustained"

suspensions that have been overturned by independent arbitrators. Furthermore, the Plaintiff had never seen or been aware of many of the complaints alleged by Defendant Keenan to have been filed.

57. On October 7, 2011, the Plaintiff requested a copy of his complete personnel records file pursuant to M.G.L. c.149, §52C. The request included all three files maintained by the Department; to wit, his personnel file, "internal affairs" file, and medical file. The Plaintiff's request was denied by the Chief in violation of the statute.

58. On March 12, 2012, Defendant Keenan revoked the Plaintiff's "License To Carry" by reason of "threats" allegedly made against Ms. Webber. Defendant Keenan issued a "License to Carry" to Ms. Webber.

59. On March 15, 2012, Defendant Keenan told the Patriot Ledger that the Plaintiff followed a civilian complaint witness (Ms. Webber) into the police station and "intimidated" her. The Plaintiff had entered the station to use his credit union's ATM machine. The Plaintiff never had any visual or verbal contact with Ms. Webber whatsoever during the alleged "intimidation."

60. On April 23, 2012, Defendant Keenan requested termination of the Plaintiff's employment, and on April 25, 2012, Mayor Koch advised the Plaintiff that a May 16, 2012 disciplinary hearing would be held to seek termination.

61. Throughout the past two years, Defendant Keenan has consistently requested disciplinary action above and beyond the five (5) day maximum he is entitled to levy and has made widely known his desire to terminate the Plaintiff's employment via multiple newspaper articles. Attached hereto as **Exhibit F**.

62. In a May 2, 2012 article appearing in the Patriot Ledger newspaper, the Chief again publicly criticized the Plaintiff regarding the neighborhood dispute by stating "In my 29 years on the force, there's been nothing like this that I can remember." Attached hereto as **Exhibit F**.

63. Defendant Keenan has failed to maintain neutrality in the investigation of the matters involving the Plaintiff and has utilized the media to publicly disparage the Plaintiff, leading to the demonization of the Plaintiff in the public's eyes and the active encouragement and/or solicitation of neighbor complaints.

## COUNT ONE - WHISTLEBLOWER (M.G.L. ch. 149, § 185)

64. The Plaintiff repeats, realleges and incorporates by reference as if set forth hereto in their entirety Paragraphs 1 through 63 of this Complaint.

65. Plaintiff, through various means and measures, reported, objected to, filed complaints and issued citations about ongoing violations of law in the City of Quincy.

66. Plaintiff has been retaliated against for such actions by the City of Quincy and its employees, officials, and agents. As a result of raising these issues and performing his Official

and civic duties, Plaintiff was subsequently subjected to disparate treatment, a hostile work environment, retaliatory acts, and now faces termination from his employment.

67. As a consequence of the Defendants' actions, Plaintiff suffered and continues to suffer damages, including but not limited to: loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional and mental distress.

WHEREFORE, Plaintiff demands judgment against the Defendants on Count I, plus interest and costs of this action, and reasonable attorneys' fees.

## COUNT TWO - Civil Rights (M.G.L. ch. 12, §§ 11H, I)

68. The Plaintiff repeats, realleges and incorporates by reference as if set forth hereto in their entirety Paragraphs 1 through 67 of this Complaint.

69. Defendant Keenan, in his official and individual capacity, and under color of law, attempted to interfere with, and interfered with plaintiff's exercise and enjoyment of rights secured by the constitution and laws of the United States, and the constitution and laws of the Commonwealth, by threats, intimidation and coercion, including his right to free speech and equal protection of the laws.

70. Defendant Dougan, in his official and individual capacity, and under color of law, attempted to interfere with, and interfered with plaintiff's exercise and enjoyment of rights secured by the constitution and laws of the United States, and the constitution and laws of the Commonwealth, by threats, intimidation and coercion, including his right to free speech and equal protection of the laws.

WHEREFORE, Plaintiff demands judgment against the Defendants on Count II, plus interest and costs of this action, and reasonable attorneys' fees.

## COUNT THREE— Civil Rights (42 U.S.C., § 1983)

71. The Plaintiff repeats, realleges and incorporates by reference as if set forth hereto in their entirety Paragraphs 1 through 70 of this Complaint.

72. Defendant Keenan, in his official and individual capacity, and under color of law, attempted to interfere with, and interfered with, plaintiffs exercise and enjoyment of rights secured by the constitution and laws of the United States, including his right to free speech and equal protection of the laws.

73. Defendant Dougan, in his official and individual capacity, and under color of law, attempted to interfere with, and interfered with, plaintiffs exercise and enjoyment of rights secured by the constitution and laws of the United States, including his right to free speech and equal protection of the laws.

WHEREFORE, Plaintiff demands judgment against the Defendants on Count III, plus interest and costs of this action, and reasonable attorneys' fees.

## COUNT FOUR- CONSPIRACY

74. The Plaintiff repeats, realleges and incorporates by reference as if set forth hereto in their entirety Paragraphs 1 through 73 of this Complaint.

75. The City of Quincy and its employees, including the individual Defendants, have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of a common plan or design to retaliate against Plaintiff and ultimately remove Plaintiff from his employment.

76. The unlawful means and purpose of this conspiracy were undertaken in retaliation for Plaintiff's reports, objections, complaints, and citations about violations of law in the City of Quincy.

WHEREFORE, Plaintiff demands judgment against the Defendants on Count IV, plus interest and costs of this action, and reasonable attorneys' fees.

## COUNT FIVE- DEFAMATION - LIBEL

77. The Plaintiff repeats, realleges, and incorporates by reference as if set forth hereto in their entirety Paragraphs 1 through 76 of this complaint.

78. Defendant Keenan, in his official and individual capacities, knowingly made false and/or reckless statements injurious to Plaintiff's reputation on multiple occasions to newspaper reporters regarding the Post Island Road dispute and matters surrounding the Plaintiff's employment.

79. Defendant Keenan's remarks have been published in multiple newspaper articles, including the Boston Globe and the Patriot Ledger.

WHEREFORE, Plaintiff demands judgment against the Defendants on Count V, plus interest and costs of this action, and reasonable attorneys' fees.

THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,
For Plaintiff Joseph McGunigle,
By his attorney,

_____
Timothy M. Burke, BBO #065720
160 Gould Street, Suite 100
Needham, MA 02494-2300
(781) 455-0707

Dated: May 11, 2012