# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
**JOSEPH McGUNIGLE,**                                   )
)
**Plaintiff,**                              )
)          **Civil Action No.**
**v.**                                     )          **12-10852-FDS**
)
**CITY OF QUINCY; PAUL KEENAN,**                         )
**in his individual and official capacities;**          )
**and JOHN DOUGAN, in his individual**                  )
**and official capacities,**                            )
)
**Defendants.**                           )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil action brought by a former police officer for alleged violations of his
constitutional rights and for various state-law claims. Plaintiff Joseph McGunigle has filed suit
against the City of Quincy, Chief of Police Paul Keenan, and Captain John Dougan, alleging that
they unlawfully retaliated against him for engaging in protected conduct. Specifically, he
contends that he was wrongfully disciplined, and eventually terminated, by defendants for
making comments to local news organizations concerning violations of Quincy city dog
ordinances.

The City of Quincy and Keenan and Dougan, in their official capacities, have filed a
motion for summary judgment. Keenan and Dougan have also filed a motion for summary
judgment as to the claims against them in their individual capacities. For the following reasons,
the motions will be granted.

# I.   Background

## A.   Factual Background

### 1.   Parties

Plaintiff Joseph McGunigle became a patrol officer with the Quincy Police Department in 1997.  (Def. SMF ¶ 1; Ex. 1; McGunigle Dep. 89-91).  As a patrol officer, he took an oath of office whereby he swore that he would "faithfully and impartially discharge and perform all the duties incumbent on [him] . . . according to the best of [his] abilities and understanding, agreeably, to the rules and regulations of the Constitution, and the laws of the Commonwealth and the Ordinances of the City of Quincy."  (*See* Def. SMF Ex. 16).

Between 1998 and 2005, McGunigle was disciplined multiple times for varying types of violations.  (Def. SMF Ex. 2).  The discipline included oral reprimands, written reprimands, suspension from details, restrictions on police activities, and a five-day suspension without pay. (*Id.*; *see also* McGunigle Dep. 2-79-114).

Defendant Paul Keenan has served in the Quincy Police Department since at least 1983. (Keenan Dep. 5-6).  He was a police captain from 2005 until July 2008.  (*Id.*).  In July 2008, he replaced Robert Crowley as the Chief of the Quincy Police Department.  (*Id.*).  At all relevant times, defendant John Dougan served as a captain in the Quincy Police Department.

### 2.   Events from September 2006 to September 2007

On September 28, 2006, McGunigle and his wife, Dianne Kane-McGunigle, purchased a home at 45 Post Island Road in Quincy.  (Compl. ¶ 5).  According to McGunigle, soon after moving into the house, he and his wife began noticing violations of Quincy dog leash ordinances.  (Pl. SMF ¶ 1).  For example, on January 3, 2007, an unleashed dog attacked his dog. (Pl. SMF Ex. 11).  In March 2007, an unleashed dog attacked a mother holding a six-month-old

child. (*Id.*). A hearing was held at the Quincy Police Department concerning the latter incident. (Compl. ¶ 12; Def. SMF Ex. 3; Dougan Dep. 22-24). McGunigle had the opportunity to attend the hearing if he did not wear his uniform, but declined to change out of his uniform. (Dougan Dep. 31-33). As a result, he did not attend. (*Id.*). His wife, however, did so, and apparently testified. (*Id.* at 23).

After the hearing, on April 5, 2007, McGunigle went to Captain Dougan's office to speak with Dougan and Lieutenant Jack Sullivan. (Compl. ¶ 13; Dougan Dep. 34; McGunigle Dep. 53). At the time of the conversation, McGunigle was in uniform and on duty. (McGunigle Dep. 53-54). He allegedly wanted to show Dougan and Sullivan a videotape that he contended would disprove the testimony of one or more neighbors at the hearing. (Sullivan Dep. 58-61, 67-68; Dougan Dep. 30-32; McGunigle Dep. 53-57). However, Dougan told him that it was too late because the hearing was over. (*Id.*).

At some point around April 2007, McGunigle began reporting dog ordinance violations to Quincy Animal Control Officer Don Conboy. (McGunigle Dep. 58-59). The initial complaints were either made at the police station or by telephone. (*Id.* 59-60). An exhibit submitted by McGunigle in opposition to the motion for summary judgment purports to be a log maintained by officer Conboy. (Pl. SMF Ex. 8). It appears from the exhibit that McGunigle and his wife made many phone calls to Conboy between April 2007 and June 2014. (*Id.*; *see also* Pl. SMF Ex. 14).

In May 2007, McGunigle began issuing citations for violations of the city's dog ordinances to a number of his neighbors in the Post Island Road neighborhood. (Compl. ¶ 17; McGunigle Dep. 2:74–2:77).[1] "Most if not all" of those citations were issued to neighbors who

---

[1] McGunigle disputes this, contending that his "complaints against his neighbor pre-dated the dog hearing." (Pl. SMF ¶ 6). However, whether his complaints pre-date the hearing is not what was set forth in defendants'

had testified on the opposite side of McGunigle's wife at the hearing.  (Def. SMF ¶ 6 (citing Keenan Dep. 65-86)).  He issued the citations in his capacity as a Quincy police officer.  (McGunigle Dep. 29).  The citations could only be issued by police officers or authorized officials, not members of the public generally.  (*Id.* at 19).

After receiving citations from McGunigle, his neighbors complained to then-Chief Crowley.  (McGunigle Dep. 78).  As a result, on May 24, 2007, Crowley ordered McGunigle to stop writing dog ordinance citations to his neighbors.  (Dougan Dep. 43-44).  McGunigle refrained from issuing citations for more than a month.  During that period, he continued to report alleged violations to officer Conboy.  (Pl. SMF Ex. 8).  Eventually, however, McGunigle began to ignore Crowley's order and resumed writing citations to his neighbors.  (McGunigle Dep. 78; Dougan Dep. 52, 61-62; Pl. SMF Ex. 9 at 24-25).  His neighbors again lodged complaints with the Quincy Police Department, alleging that McGunigle was harassing them.  (*See* Pl. SMF Ex. 10).

On September 12, 2007, Crowley suspended McGunigle for five days for violating his order.  (McGunigle Dep. 78).  The union appealed the suspension on McGunigle's behalf on the ground that Crowley's order was unlawful.  (Pl. SMF Ex. 9).  The arbitrator ruled that the City of Quincy did not have just cause to suspend McGunigle "for violation of an order whose lawfulness had not been determined before [he] was suspended."  (*Id.* at 25).  The arbitrator vacated the suspension.  (*Id.*).

### 3.    September 2007 News Reports

On September 15, 2007, Channel 7 News aired television reports concerning the lack of enforcement of dog ordinances, McGunigle's actions, and his suspension.  (Compl. ¶ 30, Ex. B;

---

statement of material facts.  Rather, defendants contend that after the hearing, McGunigle began issuing citations. Because his cited documents do not contradict this fact, the Court will accept it as undisputed.

McGunigle Dep. 6-7).  In background video footage early in the report, McGunigle is pictured out of uniform talking with reporter Michelle Relerford and a police officer in uniform.  (Compl. Ex. B).  He made the following statement that was broadcast during reports:  "I'm just doing my job, you know, trying to make the neighborhood safe and, uh, enforcing some violations down there to make it cleaner."  (*Id.*).  While that statement was broadcast, the screen had a caption that read "Officer Joseph McGunigle, Quincy Police Dept."  (*Id.*).  Later in the news report, he stated, "We're not quitting; we're just beginning to fight."  (*Id.*).  While that statement was broadcast, no caption appeared on the screen.  (*Id.*).  During the interview and entire news report, McGunigle was not wearing his uniform; he was dressed in civilian clothes and standing in front of his residence.  (*Id.*).

A September 23, 2007 *Boston Globe* article also reported on the dispute between McGunigle and his neighbors. (Compl. Ex. C).  The article identified McGunigle as a Quincy police officer.  (*Id.*).  It stated that he "issued about 11 citations, with fines of $50 or $100, to neighbors for not keeping dogs on leashes and for failing to clean up after them."  (*Id.*).  He is quoted in the article as saying, "I paid $620,000 for this oceanfront home and I'm not letting dogs [defecate] on my yard."  (*Id.*).  The article includes allegations that "McGunigle intimidates [his neighbors], and videotapes them and their dogs on the beach.  [The neighbors] also say he filed a police complaint about a young child not fully clothed on the beach, and tore down a neighbor's fence when he discovered it was on his property."  According to the article,

> McGunigle acknowledges videotaping offenders, and tearing down the fence (after warning the neighbor to move it), as well as filing the beach complaint and receiving the earlier suspension.  (In that case, McGunigle says, the officer's ticket was warranted.)  But, he says all that is beside the point.  He is, he says, just doing his job and trying to keep the beach clean.  . . . An unrepentant McGunigle, 50, an officer for 10 years, said he was only enforcing the law and has done nothing wrong.  Many of the people who complained to the department are those

> to whom he issued citations, said McGunigle.  He and his wife own a year-old
> Rottweiler named Boris, who, they say, is always on a leash.

(*Id.*).  When questioned about the story, McGunigle acknowledges that he said he was only

enforcing the law.  (McGunigle Dep. 19-20).  In addition, he acknowledges that he told the

*Globe* that "he was just doing his job."  (*Id.* 25-26).

### 4.     <u>Events of 2008 and 2009</u>

On March 27, 2008, Crowley suspended McGunigle for five days in response to a

neighbor's complaint against him.  (McGunigle Dep. 2:115-16).  The nature of the complaint is

not set forth in the record.  According to McGunigle, he subsequently met with City Solicitor

James Timmins, who assured him that if he did not contest the issue, the suspension would "go

away" when Crowley retired.  (*Id.*).

Keenan was appointed Chief of Police in July 2008.  Shortly afterward, McGunigle met

with him in his office.  (McGunigle Dep. 42-48).  During that meeting, McGunigle told Chief

Keenan that he wanted to get off to a fresh start with a new chief.  (*Id.*).  According to

McGunigle, the two shook hands and agreed to "wipe the slate clean."  (*Id.*).

McGunigle testified that on July 2, 2008, during a meeting between representatives of the

Patrolman's Union and the newly-appointed Keenan, "one of the main topics [of conversation]"

was McGunigle's five-day suspension.  (McGunigle Dep. 2:56-57).  According to McGunigle,

during the discussion, Keenan "was adamant" that McGunigle accept a two-day suspension.

(*Id.*).  When asked whether it was "personal" between him and McGunigle, Keenan allegedly

acknowledged that it was.  (*Id.* 2:56-57, 2:115-16).[2]  It is unclear whether the meeting between

Chief Keenan and the Patrolman's Union occurred before or after his meeting with McGunigle.

---

[2] The record appears to indicate that the suspension ended up being revoked, and McGunigle had "restored
to him five vacation days."  (Pl. SMF Ex. 20).

In early July 2009, McGunigle's brother was involved in an altercation with another man in Abington, Massachusetts. (McGunigle Dep. 79-80). The other man died as a result of the injuries he sustained in the fight. (*Id.*). His brother was criminally charged, and McGunigle attended his brother's arraignment. (*Id.* at 80-81). According to McGunigle, he missed work on July 10, 11, 15, 16, and 17 because of the incident. Richard Black, McGunigle's personal physician, wrote a note dated July 13, 2009, stating that "Joseph has a mental health issue and was out of work on July 10 and 11 and will be out of work on July 15, 16, and 17." (Def. SMF Ex. 6). On that note, McGunigle handwrote "Family Matters." (*Id.*; McGunigle Dep. 81-82). McGunigle submitted the note to his employer.

Chief Keenan contends that as a result of Dr. Black's note, he placed McGunigle on leave and ordered him to surrender his firearm. (Keenan Dep. 100-03).[3] He also ordered McGunigle to undergo a psychiatric evaluation with Dr. Michael Rater prior to returning to work. (*Id.*). Chief Keenan testified that he requested the evaluation be conducted immediately because he "was interested in making sure that he was evaluated so he could go back to the street and carry a firearm." (Keenan Dep. 101-02). According to McGunigle, despite being willing to undergo a psychiatric evaluation, he had to wait nearly 30 days before he "got to go see Doctor Rater." (McGunigle Dep 2:115-20). In the meantime, Dr. Black wrote two more letters on McGunigle's behalf. On July 21, 2009, Dr. Black wrote that "[m]y patient was out of work July 10th, 11th, 15th, 16th, [and] 17th. He has been assisting his family during a 'family crisis.' His absence was not due to personal mental health issues. I thank you in advance for your cooperation thru this difficult time." (Pl. SMF Ex. 16). On July 27, 2009, Dr. Black wrote that "[m]y patient . . .

---

[3] McGunigle disputes that the decision to put him on leave was a result of the note and contends that the order was the result of alleged abuse of his sick time. However, it is undisputed that Chief Keenan received the note before he placed McGunigle on administrative leave and ordered him to surrender his weapon. (McGunigle Dep. 2-47-48).

may return to work full time no restrictions as of July 18th, 2009 [sic]. Thank you for your cooperation." (*Id.*).

During the time McGunigle was waiting for the psychiatric evaluation, he was on leave, and unable to work overtime or details. (Keenan Dep. 102-03). On August 11, 2009, McGunigle met with Dr. Rater for his psychiatric fitness-for-duty evaluation. (Pl. SMF Ex. 17). On September 8, 2009, Dr. Rater found McGunigle fit to return to duty. (*Id.*). On December 21, 2009, the City of Quincy agreed to restore 58 sick days that McGunigle used during the time he was on administrative leave. (*Id.*).

### 5.       2010 FMLA Leave

In January 2010, McGunigle's wife had a heart attack. (Keenan Dep. 114). McGunigle requested and was immediately granted three months of leave under the Family Medical Leave Act ("FMLA"). (*Id.*).

In April 2010, McGunigle received a call from the union president telling him that his family medical leave was up, and that he was being ordered back to work by the chief's office. (McGunigle Dep. 2:52). McGunigle contends that he was wrongly told that his leave time had expired. (*Id.* at 2:52-53). In May 2010, he received a letter from Chief Keenan saying that the time he had been taking was unexcused sick time because his family medical leave had not been approved. (*Id.* at 2:53-56). At some point, McGunigle was told by Captain Dougan that "if you call in sick Friday to take your wife to the doctor, I will be forced to take disciplinary action against you." (*Id.* at 2:57-58; Dougan Dep. 127-31).

Chief Keenan contends that leave was originally approved for three months, through April 13, 2010. (Keenan Dep. 115-16; Def. SMF Ex. 8). According to Keenan, McGunigle continued to take medical leave past that date without providing any updates; he "was asked

several times for updates and he never provided any." (Keenan Dep. 116). As a result,

McGunigle was charged sick or vacation time during that time period. (*Id.* at 116-17). On

August 23, 2010, Chief Keenan sent McGunigle a letter in which he wrote,

> Over the last several months I have made repeated requests to you through the attorney for the [union], Paul Hynes, as well as various members of the patrol association e-board and finally your own attorney Tara M. Swartz to provide updated information concerning your request for an extension of your Family Medical Leave. You are required to provide the information I requested under laws governed by the Family Medical Leave Act.
>
> To date, none of the information I requested has been provided and your request is not being considered. As a result, you have exceeded the six (6) unexcused sick days allowed by the agreement with the [union] and any days that you take going forward chargeable to sick leave will require medical documentation in the form of a sick note from your physician.

(Def. SMF Ex. 9). Shortly thereafter, the dispute was resolved. McGunigle's leave was

recognized as FMLA leave, and what had been charged as sick time was restored. (McGunigle

Dep. 2:53-54; Keenan Dep. 115-16).

### 6.     The July 2011 Incident

On July 30, 2011, McGunigle confiscated some traffic cones from the edge of the

driveway of his neighbor Michelle Webber. (McGunigle Dep. 141-42; 2:140-55; Def. SMF Ex.

10; Pl. SMF Ex. 12).[4]  Webber had previously been the target of citations from McGunigle for

dog ordinance violations. (Def. SMF Ex. 10). Although Webber told him that she owned the

cones, McGunigle confiscated them because he believed they belonged to National Grid.

(McGunigle Dep. 2:140-55). According to multiple witnesses, McGunigle's demeanor was

hostile and rude. (Def. SMF Ex. 10).

---

[4] In their statement of material facts and memoranda, defendants appear to incorrectly identify the date of the incident as July 11, 2011. However, the testimony from McGunigle, the complaint of misconduct filed by his neighbor, and the report of the hearing officer all indicate that the incident that occurred on July 30, 2011. (*See* McGunigle Dep. 141-42; Def. SMF Ex. 10; Pl. SMF Ex. 12).

McGunigle was suspended pending an investigation and hearing. (Def. SMF ¶ 33; McGunigle Dep. 2:156). He was ordered to turn in his firearm and stay away from the premises of the Quincy Police Department. (Def. SMF ¶ 33; McGunigle Dep. 2:156).

At the hearing, one witness testified that McGunigle placed his hand on his gun during the episode with Webber; another witness testified that he was angry, hostile, aggressive, and threatening; and a third witness testified that he appeared out of control. (Def. SMF ¶ 33; Pl. SMF Ex. 12). McGunigle denied any such conduct. (Pl. SMF Ex. 12; *see also* McGunigle Dep. 2:149-52).

At some point in early 2012, the hearing officer issued a report, finding no violation as to two of the three charges. (Pl. SMF Ex. 12). Specifically, he found no violation as to charge one (concerning the handling of evidence) and charge two (concerning truthfulness). (*Id.*). However, he found against McGunigle on charge three, which was a personal conduct allegation that McGunigle was rude and insolent to a member of the public. (*Id.*). The hearing officer recommended that the Quincy mayor affirm a five-day suspension without pay, and that "McGunigle be suspended for a period up to thirty days (to include the five days ordered, above) and ordered to [a]nger [m]anagement [t]raining, which course may be attended concurrent with his return to work." (*Id.*). On March 9, 2012, the mayor accepted the hearing officer's report, and as a result, McGunigle was suspended for thirty days and ordered to attend anger management classes. (Def. SMF Ex. 10D).

While the matter was pending, on September 27, 2011, McGunigle requested a copy of his personnel file. (McGunigle Dep. 2:59-60).[5] McGunigle "was handed one file that had four pieces of paper in it and told by . . . Dougan that that was everything." (McGunigle Dep. 2:60).

---

[5] McGunigle contends that he requested a copy of his personnel records file on October 7, 2011. (Pl. SMF ¶ 29). However, the record cited does not support that contention. Rather, he appears to identify September 27, 2011, as when he made the relevant request. (McGunigle Dep. 2:58-66).

Because he did not believe the file was complete, McGunigle filed a written complaint with the Massachusetts Attorney General's office. (McGunigle Dep. 2:61). Shortly thereafter, he was informed by someone in the Attorney General's office that Chief Keenan "was in the process of giving all [his] files to [the] union attorney at the time." (McGunigle Dep. 2:63-64). By the end of October 2011, McGunigle met with the union attorney and was able to review his personnel file. (McGunigle Dep. 2:65-66). According to Chief Keenan, the handling of McGunigle's "request to review his personnel file had nothing to do with his actions in 2007. The [Quincy Police Department] would have taken the same steps concerning his request to review his personnel file, regardless of the 2007 dog-citations issue." (Keenan Aff. ¶ 21).

On October 17, 2011, while the matter concerning the traffic cones was pending, McGunigle visited the public lobby of the Quincy Police Station. At the time, he was on paid leave and subject to a stay-away order. (McGunigle Dep. 2:156-63; Def. SMF Ex. 11A). He was aware that Webber had filed a complaint against him and would be testifying against him at the cone incident hearing. (McGunigle Dep. 2-156-63; Def. SMF Ex. 11D). Webber, who had filed the complaint against him, was present at the police station that day. (Def. SMF Ex. 11A). She was apparently at the police station to apply for a firearm license. (Def. SMF Ex. 11D). She met with Donna Rae Mollica, who is a civilian employee of the Quincy Police Department who serves as the administrator for firearm licensing. (*Id.*). Within minutes of Webber's arrival at the police station, while Mollica and Webber were talking in the lobby, Lieutenant Jack Sullivan observed McGunigle arrive at the station. (*Id.*). As a result, he ushered Webber and Mollica out of the lobby into the Records Room so that Webber and McGunigle would not encounter each other. (*Id.*).

McGunigle contends that he went to the station in order to use an ATM machine in the lobby. (*Id.*). Webber did not see McGunigle at the station that day. (*Id.*). However, Lieutenant Sullivan informed her of his presence, which made her "visibly upset and shaken." (*Id.*). Based on the incident, McGunigle was charged by Keenan with additional violations, including violation of the stay-away order and attempted or actual intimidation of a witness. (Def. SMF Exs. 11A-11D).

On March 12, 2012, Chief Keenan revoked McGunigle's license to carry a firearm. (Keenan Dep. 140). He did so because he believed that McGunigle was "unfit to carry a firearm." (*Id.*). On April 23, 2012, Chief Keenan "recommended to the [a]ppointing [a]uthority that . . . McGunigle be terminated [as a police officer] because, among other things, he no longer had a [License to Carry], [which is] a requirement for being employed as a police officer." (Keenan Aff. ¶ 22; *see also* Pl. SMF Ex. 13).

On May 18, 2012, Stephen McGrath presided as a hearing officer to consider whether "termination/disciplinary action should be taken against" McGunigle based on various charges. (Def. SMF Ex. 11D). Specifically, McGunigle was charged with

> 1) losing his License to Carry a firearm which is a condition of employment; 2) on or about October 17, 2011 violating a direct order from Chief Paul Keenan to stay away from One Sea Street (Quincy Police Headquarters); 3) on or about October 17, 2011, attempting to or intimidating a witness that had filed a prior complaint against him; and 4) his disciplinary history and work record demonstrates an inability to conform to the standards of the Quincy Police Department.

(Def. SMF Ex. 11D). In a findings and report issued June 12, 2012, the hearing officer "found that . . . McGunigle has been charged with four separate offenses, and the City has sustained its burden of proof on each of the charges." (Def. SMF Ex. 11D). As a result, the appointing authority terminated McGunigle's employment. (Keenan Aff. ¶ 22).

On December 4, 2012, the revocation of McGunigle's license to carry was upheld by the Quincy District Court. *McGunigle v. Quincy Police Department*, Docket No. 1256 CV 0849 (Quincy Dist. Ct. Dec. 4, 2012) (attached as Def. SMF Ex. 12). The court found that

> Between 2007 and August 24, 2011, McGunigle has been the subject of over twenty complaints to the Quincy Police Chief's office made by his neighbors. . . . It is simply plain that, if not in fact, McGunigle breached the spirit of the stay away order. And, it is even more plain, that Keenan could reasonabl[y] have found that McGunigle was a person who in his neighborhood was out of control and who reflected poor decision making. When all the behavior is pieced together, including the lobby incident, it was reasonable for Keenan to conclude that McGunigle's behavior was not of him testing constitutional rights, but, rather an escalation of improper behavior and that the revocation of his firearm license was needed to ensure safety. Apart from any employment issue, the record does not establish that the revocation of McGunigle's firearm license was arbitrary, capricious, or an abuse of discretion. Put differently, under the standard as expressed above, this court does not conclude that Keenan had no reasonable grounds to take the action which is at issue.

*Id.*

On January 27, 2013, an arbitrator affirmed McGunigle's termination, finding that the City of Quincy "had just cause to terminate" his employment on grounds that his license to carry had been revoked, and that the revocation had been affirmed by the district court. (Pl. SMF Ex. 13; *see also* Keenan Aff. ¶ 22; McGunigle Dep. 2:167). The arbitrator did not consider "the other cited bases for termination." (Pl. SMF Ex. 13). The arbitrator's decision was not appealed and is now final. (Def. SMF at 46).

On July 3, 2014, the Massachusetts Superior Court affirmed the district court's decision to uphold the revocation of McGunigle's license. *McGunigle v. Keenan*, No. CV2013-00078 (Norfolk Cnty. Superior Ct. July 3, 2014) (attached as Def. SMF Ex. 13). The Superior Court explained that in affirming Keenan's decision to revoke McGunigle's license, the district court relied on three separate incidents involving situations "in which McGunigle exhibited threatening or harassing behavior and indications of anger management problems." *Id.* at 2.

"Given the numerous complaints from neighbors and other citizens about McGunigle's threatening or harassing behavior and the allegation from a neighbor that he used his service weapon on at least one occasion to give further weight to a threat," the Superior Court found "support in the record for the [d]istrict [c]ourt's conclusion that Keenan had reasonable grounds for revoking McGunigle's [license to carry]." *Id.* at 5.

McGunigle did not further appeal the revocation of his license to carry or his termination. (McGunigle Dep. 2:158).

### 7.   <u>Alleged Defamation</u>

McGunigle identifies three newspaper articles in support of his defamation claim against Chief Keenan.  (Compl. ¶¶ 54, 59, 62; Compl. Ex. E).  In a March 12, 2012 Quincy *Patriot Ledger* article, Chief Keenan, with respect to the "cone incident," was quoted as saying that McGunigle's "version differed considerably from all of the eyewitness versions.  Untruthfulness for a police officer is a serious infraction."  (Compl. Ex. E).  According to McGunigle, he took the quote "as some sort of an attack on [his] character."  (McGunigle Dep. 2:209).

In a March 21, 2012 *Patriot Ledger* article, Chief Keenan is quoted as saying "[b]asically he walked to an ATM, but I don't believe he conducted business. . . .  We don't believe that he had a legitimate purpose to be in there.  I believe it was in an effort to intimidate the witness in the previous disciplinary case."  (Pl. SMF Ex. 11).

In a May 2, 2012 *Patriot Ledger* article entitled "Upcoming hearing could lead to firing of Quincy officer," Chief Keenan is quoted as saying "[i]n my 29 years on the force, there's been nothing like this that I can remember."  (Compl. Ex. F).  The quote follows a paragraph that states that McGunigle "who got the nickname "Robocop" for aggressive neighborhood actions

14

faces a second disciplinary hearing May 16, and this time [p]olice [c]hief Paul Keenan wants him fired." (*Id.*).

B.    **Procedural History**

On May 11, 2012, McGunigle filed the complaint in this action.  The complaint alleged claims under the Massachusetts Whistleblower Act, under the Massachusetts Civil Rights Act, under 42 U.S.C. § 1983, for conspiracy, and for defamation.

On June 26, 2012, defendants moved to dismiss the complaint for failure to state a claim. McGunigle did not file an opposition.  On July 19, 2012, Judge Stearns, who was presiding over the case at the time, granted the motion to dismiss in part and denied it in part.  On August 2, 2012, Judge Stearns allowed McGunigle's motion for reconsideration, and ordered the parties to file further briefs.  The matter was then reassigned to Judge Tauro.

On May 16, 2013, Judge Tauro granted the motion to dismiss to the extent plaintiff's section 1983 claims concerned allegations prior to May 11, 2009.  He also granted the motion to dismiss plaintiff's equal protection claim.  Judge Tauro declined to rule on the remaining state-law claims to allow the parties additional time to brief those issues.

On July 25, 2013, Judge Tauro issued a memorandum and order in which the motions to dismiss were allowed in part and denied in part.  Specifically, the court dismissed the claims (1) under the Massachusetts whistleblower statute, Mass. Gen. Laws ch. 149, § 185; (2) under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H, I, against the City of Quincy and Keenan and Dougan in their official capacities; (3) for conspiracy; and (4) for defamation against the City of Quincy, Keenan in his official capacity, and Dougan in both his individual and official capacities.  As a result, the following claims remain in the case:  (1) the claim under the Massachusetts Civil Rights Act against Keenan and Dougan in their individual capacities

(Count Two); (2) the claim under 42 U.S.C. § 1983 against all defendants (Count Three); and (3) the claim for defamation against Keenan in his individual capacity (Count Five).

On November 7, 2013, McGunigle filed a motion to amend the complaint adding, among other things, allegations about his termination from employment as a Quincy Police officer to his First Amendment retaliation claim.  On December 12, 2013, Judge Tauro denied the motion on grounds that "[a]ppreciable delay alone is enough to justify denying a motion to amend." (Docket No. 49).

The City of Quincy and Keenan and Dougan, in their official capacities, have moved for summary judgment.  Keenan and Dougan have also moved filed a motion for summary judgment on claims against them in their individual capacities.[6]

## II.     Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

[6] Defendants also filed a motion to strike McGunigle's statement of material facts.  During the motion hearing, the Court found that the statement of material facts was not in compliance with Local Rule 56.1.  The motion to strike was granted in part and denied in part, and McGunigle was permitted to file a corrected statement of material facts.  He filed a corrected statement of material facts on March 23, 2015.  Defendants renewed their motion to strike on April 21, 2015.  They contend that the revised statement of material facts "still fail[s] to meaningfully controvert [d]efendants' Local Rule 56.1 factual statement in a concise and specific manner that requires the Court to conclude that there is a genuine need for trial."  (Def. Mot. Strike, Docket No. 86).  Although McGunigle's revised statement of material facts is convoluted, and contains many statements that appear to be unsupported by the record as well as other statements that appear to be unresponsive to defendants' statement of material facts, the Court was able to discern the facts from the record, and the motion for summary judgment is being granted in defendants' favor.  Therefore, the motion to strike the revised statement of material facts will be denied as moot.

bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   In making that

determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009).   When "a properly supported motion for summary judgment is made, the adverse party

'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).   The non-moving party

may not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence." *Id*. at 256-57.

## III.   Analysis

### A.      Section 1983 Claim

McGunigle contends that defendants, acting under color of state law, took adverse

employment actions against him in retaliation for the exercise of his constitutional right of free

speech.   McGunigle's constitutional claim is based on (1) his appearance on a Channel 7 news

segment, (2) statements he made to the *Boston Globe*, and (3) reports he made to Officer Conboy

about dog-ordinance violations.[7]   He contends that the statements and reports constituted activity

protected under the First Amendment, and that the named defendants violated his constitutional

rights by retaliating against him.

---

[7] In his statement of material facts, McGunigle contends that in addition to reporting dog-ordinance violations to Conboy, he also sent letters to then-Mayor William Phelan and City Councilor Leo Kelly, made numerous verbal complaints to city officials, made a complaint to the Conservation Commission, and had conversations with various neighbors regarding their non-compliance with dog ordinances.   (Pl. SMF Response ¶ 17).   He appears to rely in large part on his wife's deposition to support the contention that he made numerous complaints to city officials.   (*See* Pl. SMF ¶ 5).   However, it is unclear from both his wife's testimony and his own testimony if, when, how, to whom, and by whom complaints were made.   (*See* McGunigle Dep. 58-71; Dianne Kane-McGunigle Dep. 25, 99-101, 107-12).   Therefore, to the extent that McGunigle relies on any of those letters, verbal complaints, and conversations for his First Amendment retaliation claim, the record does not contain sufficient evidence to support the claim.   Accordingly, the relevant speech will be limited to the Channel 7 news segment, the *Boston Globe* article, and the reports to Officer Conboy.

"To determine whether an adverse employment action against a public employee violates [his] First Amendment free speech rights, [the First Circuit] has articulated a three-part inquiry." *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011) (footnote omitted) (citing *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 765-66 (1st Cir. 2010); *see also Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008); *Curran v. Cousins*, 509 F.3d 36, 44-45 (1st Cir. 2007).  To prevail on a § 1983 retaliation claim, a public-employee plaintiff must establish:  (1) that he "spoke as a citizen on a matter of public concern"; (2) that his interest in commenting upon these matters outweighed defendant's interest in the efficient performance of its public services; and (3) that the "protected expression was a substantial or motivating factor in the [defendant's] adverse employment decision."  *Decotiis*, 635 F.3d at 29 (quoting *Curran*, 509 F.3d at 45 (1st Cir. 2007)); *see also Davignon*, 524 F.3d at 100.  The first two factors raise questions of law for the court.  *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003); *see also Davignon*, 524 F.3d at 100; *Bergeron v. Cabral*, 535 F. Supp. 2d 204, 211 (D. Mass. 2008).  Whether protected speech was a motivating or substantial factor in the decision to take an adverse employment action raises issues of fact, the resolution of which is ordinarily a question of fact for the jury. *See Davignon*, 524 F.3d at 100-01; *see also Nethersole v. Bulger*, 287 F.3d 15, 18-19 (1st Cir. 2002).[8]

## 1.   Whether McGunigle Spoke as a Citizen on Matter of Public Concern

The first step itself has two subparts:  the plaintiff must establish (1) that "the speech touched upon a matter of public concern" and (2) that he spoke as a "citizen" rather than as an

---

[8] If the plaintiff satisfies his burden on the "substantial or motivating factor" element, the defendant must then be afforded an opportunity to show by a preponderance of the evidence that he "would have made the same decision regardless of the protected expression." *Davignon*, 524 F.3d at 106 (quoting *Mt. Healthy*, 429 U.S. 274, 287 (1977)); *see also Curran*, 509 F.3d at 45; *O'Connor v. Steeves*, 994 F.2d 905, 913 (1st Cir. 1993).  However, resolution of these questions of fact must ordinarily await consideration by the jury at trial. *See Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003).

employee. *Decotiis*, 635 F.3d at 30; *see also Curran*, 509 F.3d at 45 (citing *Garcetti v. Ceballos*,

547 U.S. 410, 418 (2006).

"Whether an employee's speech involves a 'matter of public concern' is a case-specific,

fact-dependent inquiry." *Curran*, 509 F.3d at 46. The court looks to the "content, form, and

context of a given statement as revealed by the whole record." *Davignon*, 524 F.3d at 101

(quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). "Where speech relates to a matter of

inherent public concern, such as official malfeasance or the neglect of duties, this inquiry is

confined to the subject matter of the speech." *Decotiis*, 635 F.3d at 30.

Here, there does not appear to be any dispute that McGunigle's speech concerned a

matter of public concern. He spoke to the *Boston Globe* and Channel 7 News about his attempts

to enforce dog ordinance laws, and he contacted Officer Conboy to report alleged dog-ordinance

violations.

Defendants contend, however, that McGunigle was not speaking as a citizen. A public

employee who is speaking as an employee, rather than as a citizen, has no First Amendment

cause of action based on his "employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. In

other words, the focus in this context is not on the content of the speech, but "the role the speaker

occupied when he said it." *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir.

2007). Again the issue presents a threshold question of law for the court. *See Spiegla v. Hull*,

481 F.3d 961, 965 (7th Cir. 2007) ("The 'inquiry into the protected status of speech is one of

law, not fact.'" (quoting *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983)); *Foley v. Town of

Randolph*, 601 F. Supp. 2d 379, 384 (D. Mass. 2009).

To determine whether a public employee made speech as an employee or a citizen, the

court must first identify plaintiff's official responsibilities. *Decotiis*, 635 F.3d at 31. In

identifying his official responsibilities, "the proper inquiry is 'practical' rather than formal, focusing on 'the duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description." *Id.* (internal quotation marks omitted) (quoting *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 26 (1st Cir. 2010)).  Here, McGunigle's official responsibilities were those of a non-supervisory police officer:  he had the authority, among other things, to issue citations for violations of city ordinances, but not to set enforcement priorities or department policies.

The next question is whether "the speech at issue [was] made pursuant to [the employee's] responsibilities." *Id.* at 32 (quoting *Mercado-Berrios*, 611 F.3d at 26).  "To determine whether such speech was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech." *Id.*  The First Circuit has identifies several non-exclusive factors that are instructive:  (1) "whether the employee was commissioned or paid to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [his] place of employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [he] spoke (lending it 'official significance')"; (6) "whether the employee's speech derived from special knowledge obtained during the course of [his] employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id.*

There are certainly reasons to conclude that McGunigle spoke as an employee rather than as a citizen.  Among other things, the content and subject matter of the speech gave the appearance that he was speaking about doing his job and enforcing the laws; there is no clear citizen analogue to the speech; the report to Officer Conboy was made in the course of his employment; and an objectively reasonable observer would likely have had the impression that

he spoke as a police officer and not as a citizen.  However, the Court does not need to reach the issue, because the § 1983 claim fails on other grounds.  It will therefore assume, for present purposes, that McGunigle spoke as a citizen rather than as an employee when he engaged in the disputed speech.

### 2.  Whether McGunigle's Interests Outweigh the Public Employer's Interests

The second step of the inquiry is determining whether the employee's "interest in commenting upon these matters outweighed defendant's interest in the efficient performance of its public services."  *Decotiis*, 635 F.3d at 29.  To strike that balance, the court must employ the "*Pickering* test."  *Decotiis*, 635 F.3d at 35.  "The *Pickering* test attempts to 'balance the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.'"  *Id.* (quoting *Guilloty Perez v. Pierluisi*, 339 F3d 43, 52 (1st Cir. 2003)); *see also Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, Will Cnty. Ill.*, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").  "In assessing the government's interest in allaying disruption and inefficiencies in the workplace, a court should include in its considerations (1) 'the time, place, and manner of the employee's speech,' and (2) 'the employer's motivation in making the adverse employment decision.'"  *Decotiis*, 635 F.3d at 35 (quoting *Davignon*, 524 F.3d at 104).  The "*Pickering* balancing test requires a hard look at the facts of the case, including the nature of the employment and the context in which the employee spoke."  *Id.*

First, the Court must assess the value of McGunigle's speech.  "[T]he greater the value of the subject of the speech to the public, the more the balance tilts towards permitting the employee to express himself."  *Guilloty Perez*, 339 F.3d at 53.  McGunigle's principal interests appear to have been to protect the value of his property, to prevent dogs from walking off leash, and to require his neighbors to clean up after their dogs.  The public interest overlaps with McGunigle's to some degree.  The public has an interest in the enforcement of the laws, even relatively minor laws such as dog ordinances.

McGunigle's motives for speaking are also "properly weighed in the balance under *Pickering*."  *O'Connor*, 994 F.2d at 915.  However, "insofar as self-interest is found to have motivated public-employee speech, the employee*'s expression* is entitled to less weight in the *Pickering* balance than speech on matters of public concern intended to serve the public interest."  *Id.*  Here, McGunigle's motives were largely personal.  He spoke about "just doing [his] job," "trying to make the neighborhood safe," and "enforcing some violations down there to make it cleaner."  Although his interest overlapped with that of the public in some ways, his speech focused on the enforcement of dog ordinances in his own neighborhood for his own personal benefit.  He was primarily motivated to speak by his concern over the value of his property and the cleanliness of his own neighborhood.  He was also motivated by a desire to defend his own actions as a police officer; he spoke about his alleged battle with the police department in the aftermath of his discipline over disobeying direct orders not to issue citations.

Under the circumstances, the value of McGunigle's speech was not particularly high. The subject matter of the disputed speech here stands in sharp contrast to other circumstances where public employees have spoken out on matters of public concern.  This was not, for example, a situation where an employee was acting as a whistleblower and exposing corruption

or malfeasance. *See Guilloty Perez*, 339 F.3d at 53. He did not reveal any new information to the public on an important issue. *See Moore v. City of Wynnewood*, 57 F.3d 924, 933 (10th Cir. 1995) ("[A]lthough providing an insider's perspective on an important issue, [plaintiff] did not reveal any new information to the public about the operation of the police department."). Nor did the matter, at heart, involve an issue of generalized public concern throughout the community or the state (like the potential impact of a tax cut on public safety); again, McGunigle's principal focus was the value of his own property and the cleanliness of his own neighborhood.

The Court must next assess the government's interests. "The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150. Defendants contend that McGunigle's speech—combined with his disobedience of the police chief's order not to write dog-ordinance citations to neighbors—"undermined not just his superiors' confidence in his loyalty and willingness to implement orders, but also his own authority as an officer with the community." (Def. Opp. 17).

The Quincy Police Department, like all law enforcement agencies, has a strong interest in maintaining the obedience and loyalty of its police officers, and in maintaining proper discipline among its employees. "Maintaining discipline and harmony in the workplace is a valid governmental interest." *Davignon*, 524 F.3d at 104. Courts have recognized that the "need for 'discipline, maintenance of harmony among co-workers, and close working relationships requiring personal loyalty and confidence is greater in the context of law enforcement.'" *Id.* (quoting *Guilloty Perez*, 339 F.3d at 53). "Therefore, courts must be sensitive to the needs of law enforcement agencies in disciplining an employee whose expressive conduct interferes with these interests." *Guilloty Perez*, 339 F.3d at 53-54.

The Department also has a strong interest in ensuring that the public perceives its law enforcement polices to be even-handed and fair.  McGunigle's unilateral and personal policy of strict enforcement of dog ordinances—against his own neighbors, to protect the value of his own property—could readily create the perception that law enforcement in Quincy was personal and vindictive rather than professional.

Furthermore, the Department has a strong interest in setting enforcement priorities and ensuring that those priorities are implemented in a fair and sensible manner.  One of the most central tasks of any police department is deciding what laws to enforce, what officer should enforce them, and which citizens should be enforcement targets.  Resources devoted to enforcing dog ordinances are resources taken away from enforcing other laws, whether that involves routine traffic patrol or responding to serious crimes.  McGunigle's speech essentially criticized, openly and publicly, the police department's enforcement priorities.

Under the circumstances, McGunigle's comments were, in substance, public acts of insubordination.  Among other things, he disobeyed a direct order not to write dog-ordinance citations to neighbors.  That behavior was obviously disruptive and undermined the police department's chain of command.  (*See* Keenan Aff. ¶ 15).  He cannot escape discipline by pairing expressive conduct with acts of disobedience that are clearly not protected.  *See, e.g.*, *Curran*, 509 F.3d at 48 (citing *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998) (explaining that "an employee who engages in unprotected conduct [cannot] escap[e] discipline for that conduct by the fact that it was related to protected conduct")).

It is not necessary that the employer actually prove that the authority of the police chief was undermined, or that discipline in the police department was affected.  "An employer need not show an actual adverse effect in order to terminate an employee" under the *Pickering* test.

24

*Curran*, 509 F.3d at 49.  "An employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'"  *Id.*  Here, it is sufficient to show that McGunigle's speech had a real and substantial potential to undermine his superiors and the department as a whole.

Balancing the relatively weak interests of McGunigle against the strong interests of the Quincy Police Department in maintaining obedience, loyalty, discipline, and the perception of fairness, the balance must be struck decisively in favor of the police department.  McGunigle's claim under § 1983 therefore fails at the second step.

### 3.   Whether the Speech Was a Substantial or Motivating Factor in the Adverse Employment Decision

Although the § 1983 claim cannot survive the *Pickering* balancing test, the Court will nonetheless proceed to the third step and address the issue of causation.  The third question asks "whether the plaintiff can show that the protected expression was a substantial or motivating factor in [an] adverse employment decision."  *Curran*, 509 F.3d at 45.

"Even if the government employee adduces sufficient evidence to convince a court that his speech merits First Amendment protection, he still must introduce sufficient evidence to permit a finding that his participation in this protected activity was a substantial or motivating factor behind the adverse employment action."  *Guilloty Perez*, 339 F.3d at 55 (citing *Mt. Healthy*, 429 U.S. at 287).  The plaintiff need not produce direct evidence of defendants' motivation, but may instead rely upon circumstantial evidence.  *Id.* at 56.  If he "succeeds in establishing this causal relationship, the burden of persuasion shifts to the defendants to prove 'by a preponderance of the evidence,' that the adverse employment action would have been taken 'even in the absence of the protected conduct.'"  *Id.* (footnote omitted) (citations omitted) (quoting *Lewis*, 321 F.3d at 219; *Mt. Healthy*, 429 U.S. at 287).  The "question of motivation,

though usually one for the factfinder, can be resolved by the court on a summary judgment . . . motion if the plaintiff's evidentiary showing is insufficient." *Id.* (citing *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 12-13 (1st Cir. 2003); *Lewis*, 321 F.3d at 220). "Although 'close temporal proximity between two events may give rise to an inference of causal connection,' that inference is 'not necessarily conclusive.'" *Lewis*, 31 F.3d at 219 (citations omitted) (quoting *Nethersole*, 287 F.3d at 20; *Hodgens*, 144 F.3d at 170).

Defendants contend that McGunigle cannot make a sufficient showing of causation because (1) he cannot show an actionable adverse employment action and (2) even if he could, the evidence does not show that his speech "was a substantial or motivating factor" behind the alleged adverse employment decision.  (Def. Opp. 18).

### a.   Whether There Was an Adverse Employment Action

"For purposes of a First Amendment retaliation claim, even in an employment setting, a plaintiff need not suffer an 'adverse employment action' as that term ordinarily is used in the employment discrimination context." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).  In the section 1983 context, the "adverse employment action" inquiry "'focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views'—or, more generally, on whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights." *Id.* (quoting *Bergeron v. Cabral*, 560 F.3d 1, 8 (1st Cir. 2009)).  "Thus, the pertinent question in a § 1983 retaliation case based on the First Amendment is whether the defendant's actions would deter 'a reasonably hardy individual[]' from exercising his constitutional rights." *Id.* (quoting *Agosto-de-Feliciano v. Aponte-Roque*, 889 F.2d 1209, 1217 (1st Cir. 1989)).  The First Circuit has found that "campaign[s] of informal harassment" can form the basis for a "First Amendment retaliation claim if the alleged

harassment would have a chilling effect." *Id.*  In fact, "[e]ven 'relatively minor events' can give rise to § 1983 liability . . . so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights." *Id.* (citations omitted) (quoting *Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004)).

McGunigle identifies a series of actions, starting in July 2009 and ending in his termination, as the adverse employment actions that form the basis for his § 1983 retaliation claims.[9]  Those incidents include (1) the July 2009 incident when he was forced to use sick days until he underwent a psychiatric fitness evaluation, (2) the handling of his FMLA leave request, (3) the handling of the request for his personnel file, (4) the revocation of his license to carry a firearm, and (5) his termination.[10]  Defendants contend that McGunigle has no actionable harm that arises from any of the incidents.

There are certainly reasons to conclude that some or all of the incidents do not constitute adverse actions.  Among other things, his sick leave was eventually restored following the July 2009 incident; his FMLA leave was eventually recognized and his sick time was restored; he was able to review his personnel file by the end of October 2011; the Quincy District Court and the Massachusetts Superior Court affirmed the decision to revoke McGunigle's license to carry a firearm; and an arbitrator affirmed his termination on grounds that a license to carry a firearm is a necessary condition of employment as a police officer.

---

[9] Judge Tauro previously determined that any adverse actions taken before May 11, 2009, are not actionable because they are barred by the statute of limitations.  (Mem., 6-7, Docket No. 29).

[10] Although Chief Keenan recommended on April 23, 2012, prior to the filing of the action, that McGunigle be terminated, and he was terminated by the city in June 2012, the termination was not finalized until January 27, 2013, when the arbitrator affirmed the termination.  Judge Tauro denied McGunigle's motion to amend the complaint to add the termination as an adverse action.  (Order, Docket No. 49).  However, because the termination was an inevitable consequence of the revocation of his license to carry, the two actions are so intertwined that the Court will treat them as forming a single adverse action.

However, the Court does not need to reach the issue, because the § 1983 claim fails on other grounds.  It will therefore assume, for present purposes, that the cumulative effect of the adverse actions identified by McGunigle could have constituted a pattern of harassment that could form the basis for a § 1983 retaliation action.

### b.        Whether the Speech Was a Substantial or Motivating Factor

McGunigle has produced no direct evidence that his speech was a substantial or motivating factor in any of the alleged adverse employment actions.  Instead, he relies entirely on circumstantial evidence; he essentially contends that his comments to the press (which occurred in September 2007) must have played some role in the various adverse employment actions (which occurred between July 2009 and his termination in June 2012) because all of those actions occurred subsequent to the speech.

There are several problems with that argument.  First, Keenan was not the chief at the time that McGunigle made the speech at issue; he did not become chief until July 2008.  The inference that Keenan retaliated against him (beginning in July 2009) for actions that occurred in September 2007 (before he became chief) is weak, to say the least.[11]  Furthermore, there is insufficient temporal proximity between the speech (in September 2007) and the alleged adverse employment actions (most notably, the termination, which occurred nearly five years later).  *See Lewis*, 31 F.3d at 219.  And there were multiple substantial intervening events, including the incident with the traffic cones (which occurred in July 2011) and the violation of the stay-away order (which occurred in October 2011).  Indeed, the record is replete with evidence of events occurring well after 2007 that called into serious question whether McGunigle had the proper

---

[11] McGunigle points to a July 2008 meeting between Keenan and representatives of the patrolman's union concerning his five-day suspension in response to a neighbor's complaint, where Keenan allegedly said it was "personal" between him and McGunigle.  There is very little in the record as to the context for that comment and little reason to believe it had anything to do with McGunigle's September 2007 speech (as opposed to his actions that led to the suspension).

judgment, temperament, and discipline to be a police officer.  Accordingly, although the "question of motivation [is] usually one for the factfinder," the evidence here is insufficient to support a claim of a causal connection between the speech and the alleged retaliation.  *See Guilloty Perez*, 339 F.3d at 56.[12]

### 4.    Qualified Immunity for Individual Defendants

Defendants contend that even if McGunigle's § 1983 retaliation claim establishes a constitutional violation, Keenan and Dougan are entitled to qualified immunity because reasonable officials would not have understood that the conduct at issue violated McGunigle's constitutional rights.

"'Because *Pickering's* constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered "clearly established" for purposes of the *Harlow* qualified immunity standard,' at least where substantial disruption has been shown to exist as a basis for the" adverse action.  *O'Connor*, 994 F.3d at 917 n.11 (quoting *Bartlett v. Fisher*, 972 F.2d 911, 916-17) (8th Cir. 1992)).  That principle clearly applies here.  Even if there were a constitutional violation, Keenan and Dougan would be entitled to qualified immunity, because objectively reasonable officials would not have understood under the circumstances that the conduct at issue could have violated McGunigle's constitutional right to free speech.  Accordingly, and regardless of the ruling as to the City of Quincy, the § 1983 claim must be dismissed as to Keenan and Dougan.

---

[12] In the alternative, defendants contend that they would have made the same decisions even absent the speech.  For example, with respect to the July 2009 placement on leave and order to undergo a psychiatric fitness evaluation, the undisputed evidence shows that the incident was a direct result of McGunigle turning in a note from his physician that stated he was having "a mental health issue."  (Def. SMF Ex. 6).  After undergoing a psychiatric evaluation, McGunigle's sick leave was restored, and there is no indication in the record that the situation would have been handled any differently in the absence of his allegedly protected speech.  It is not necessary, however, for the Court to reach the issue in light of its rulings on the *Pickering* balancing test and the lack of evidence of causation.

**B.** **Massachusetts Civil Rights Act**

Count Two alleges a claim under the Massachusetts Civil Rights Act against Keenan and Dougan in their individual capacities.

The Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12 § 11I, provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation, or coercion." *See Bally v. Northeastern Univ.*, 403 Mass. 713, 717 (1989). To establish a claim under the MCRA, plaintiff "must prove that (1) [his] exercise or enjoyment of rights secured by the Constitution or the laws of the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation, or coercion.'" *Id.* A "threat" means the "intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474 (1994). "Intimidation" means putting a person in fear for the purpose of compelling or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do. *Id.* On its face, the MCRA contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do.

For the reasons previously stated, defendants have not interfered with McGunigle's "exercise or enjoyment of rights secured by the Constitution or the laws of the United States or the Commonwealth." Therefore, the MCRA claim must be dismissed. Moreover, and in any event, he has failed to identify threats, intimidation, or coercion on the part of Keenan and

Dougan in their individual capacities that are sufficient to give rise to a claim under the MCRA.

Accordingly, defendants' motion for summary judgment will be granted with respect to Count

Two.

### C.      Defamation

Count Five alleges a claim for defamation against Keenan in his individual capacity.  To

establish a defamation claim under Massachusetts law, a plaintiff must show (1) that the

defendant made a statement concerning the plaintiff to a third party; (2) that the statement could

damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making

the statement; and (4) that the statement either caused the plaintiff economic loss or is actionable

without proof of economic loss.  *Shay v. Walters*, 702 F.3d 76, 81 (1st Cir. 2012) (citing

*Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-30 (2003)).

Police officers are public officials for purposes of analyzing a defamation claim.

*Rotkiewicz v. Sadowsky*, 431 Mass. 748, 749, 752 (2000).  Therefore, to prove fault in a

defamation case, a police officer must prove the statement was made with actual malice.  *Id.*

"[A]ctual malice means that 'the defamatory falsehood was published with knowledge that it was

false or reckless disregard of whether it was false.'"  *Id.* at 755 (quoting *Stone v. Essex Cnty.*

*Newspapers*, 367 Mass. 849, 867 (1975)).  "The inquiry is a subjective one as to the defendant's

attitude toward the truth or falsity of the statement rather than the defendant's attitude toward the

plaintiff."  *Id.*

Under the First Amendment, opinions are constitutionally protected and cannot form the

basis of a defamation claim.  *See Gertz v. Welch*, 418 U.S. 323, 339-40 (1974).  "An 'expression

of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an

action of defamation, no matter how unjustified or unreasonable the opinion may be or how

derogatory it is.'" *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003) (quoting *Dulgarian v. Stone*, 420 Mass. 843, 847 (1995). In addition, "[s]tatements that contain 'imaginative expression' or 'rhetorical hyperbole' are protected." *Levesque v. Doocy*, 560 F.3d 82, 89 (1st Cir. 2009). To determine whether or not a statement is opinion or hyperbole, "a court must examine the statement in its totality and in the context in which it was uttered or published. The court must [also] consider the words used . . . [and] all of the circumstances surrounding the statement." *Yohe*, 321 F.3d at 41.

Here, the alleged defamatory statements consisted of quotes from Keenan that appeared in three newspaper articles.

### 1. March 12, 2012 Article

In a March 12, 2012 article, Keenan was quoted as saying that McGunigle's "version [of the cone incident] differed considerably from all of the eyewitness versions. Untruthfulness for a police officer is a serious infraction." (Compl. Ex. E). Keenan contends that both sentences are true, and therefore cannot form the basis of defamation liability.

It is at least debatable whether the first sentence is literally true. There were substantial differences between McGunigle's version and that of the eyewitnesses; for example, while McGunigle "stated that the cones and extension rods were on the public street as opposed to Michelle Webber's driveway[,] . . . [other w]itnesses stated that the cones and extension rods were either within Webber's driveway, or on the edge thereof." (*See* Def. SMF Ex. 10D). There were also disputes as to whether McGunigle had contacted National Grid about the cones and his demeanor during the incident. (*Id.*) However, his version may not have literally differed "considerably" from "all" of the eyewitness versions. As for the second sentence, there does not

appear to be a dispute that untruthfulness for a police officer is a serious infraction.  (*See* McGunigle Dep. 2:209–13).

McGunigle contends that Keenan's statements, taken as a whole, imply that he lied during the investigation, and that it is defamatory because the hearing officer specifically found that he was not untruthful with regard to the incident.[13]  The quote from Keenan must, however, be read in full context.  The article concerned the "cone incident," and how the Mayor adopted the hearing officer's recommendation for a 30-day suspension even though Keenan had recommended that McGunigle be fired.  (Pl. SMF Ex. 11).  In the paragraph preceding Keenan's quote, he is paraphrased as saying that the recommendation to fire McGunigle was based on both his disciplinary history and Keenan's "belief" that McGunigle was not truthful in presenting his version of events to police.  (*Id.*).  The article specifically mentioned how Keenan had suspended McGunigle for untruthfulness, but the hearing officer did not sustain the untruthfulness charge. (*Id.*).

The quote presents Keenan's view of the situation.  If it was not literally true (because "all" of the witness accounts did not vary "considerably" from McGunigle's), an objectively reasonable observer would conclude that the difference was mere hyperbole or opinion.  There is no question that McGunigle's account differed considerably from Webber's, and that eyewitness accounts substantiated Webber's testimony.  Taken as a whole, and in context, the statement is not reasonably susceptible to a defamatory interpretation.  Therefore, under the circumstances, the quote in the March 12, 2012 article cannot form the basis for the defamation claim.

Furthermore, and in any event, the evidence does not come close to the showing of actual malice necessary to sustain an action for defamation against a public figure.  As noted, Keenan

---

[13] The hearing officer found that the Quincy Police Department had failed to carry its burden on the truthfulness issue, but that is not the same as determining that McGunigle was truthful.

believed that McGunigle was not truthful in presenting his version of events to police.  As a result, he charged him with untruthfulness.  Although the charge was not sustained, there is no evidence that the alleged "defamatory falsehood" was "published with knowledge that it was false or reckless disregard of whether it was false."  *See Rotkiewciz*, 431 Mass. at 755.  The relevant inquiry is a subjective one as to Keenan's "attitude toward the truth or falsity of the statement rather than [his] attitude toward the plaintiff," *Id.*  There is simply no evidence, direct or circumstantial, that Keenan knew or thought his statement might be false.  Nor is there evidence that he acted with "reckless disregard" for the truth or falsity of the statement.

Under the circumstances, the evidence does not establish the showing of actual malice necessary to sustain an action for defamation against a public figure.  Therefore, the statement by Keenan is not defamatory as a matter of law.

### 2.     March 21, 2012 Article

In a March 21, 2012 article, Keenan is quoted as saying "[b]asically he walked to an ATM, but I don't believe he conducted business. . . .  We don't believe that he had a legitimate purpose to be in there.  I believe it was in an effort to intimidate the witness in the previous disciplinary case."  (Pl. SMF Ex. 11).  Keenan contends that the statement is not actionable because it was an opinion, and therefore cannot form the basis of a defamation claim.  In addition, he contends that the statement was true.  Plaintiff counters that the statement was factual and false because there could be no intimidation where Keenan never came into contact with the witness.

The March 21 statement was clearly an expression of opinion, because Keenan couched it in terms of "I don't believe," "we don't believe," and "I believe."  However, and in any event, the statement could not have been made with knowledge or with reckless disregard to its falsity

34

because the hearing officer specifically determined that "more likely than not" McGunigle "was attempting to discover [the witness's] purpose for being [at the police station] perhaps with an eye to harassing her or intimidating her as a likely witness against him."  (Def. SMF Ex. 11D). McGunigle's contention that intimidation did not occur because he never had contact with the witness is irrelevant.  In the quote, Keenan stated that he believed that McGunigle was there "in an effort to intimidate the witness," not that he actually succeeded in intimidating her.  There is no dispute that McGunigle visited the police station that day despite being subject to a stay-away order.  The witness was at the station that very day.  Keenan stated that he believed that McGunigle was there to intimidate her.  The hearing officer found that this was more likely than not the situation.  Therefore, the quote by Keenan is not defamatory as a matter of law.

### 3.     May 2, 2012 Article

In a May 2, 2012 article entitled "Upcoming hearing could lead to firing of Quincy officer," Keenan is quoted as saying "[i]n my 29 years on the force, there's been nothing like this that I can remember."  (Compl. Ex. F).  The quote follows a paragraph that states that McGunigle "who got the nickname 'Robocop' for aggressive neighborhood actions faces a second disciplinary hearing May 16, and this time [p]olice [c]hief Paul Keenan wants him fired." (*Id.*).

Keenan contends that the statement was neither false nor capable of a defamatory meaning.  McGunigle appears to contend that the statement was false because "[g]iven the likely scope of unsavory incidents, confrontations, disciplinary action, and scandals occurring in the City of Quincy over a twenty-nine . . . year period," the statement could not possibly be true. However, the statement appears to be an example of "rhetorical hyperbole" that cannot form the basis for a defamation claim.  *See Levesque v. Doocy*, 560 F.3d 82, 89 (1st Cir. 2009).  The

statement is merely a commentary about how unusual Keenan perceived the situation to be, and is not susceptible to a defamatory meaning.  There are no factual statements that could possibly be false, and it therefore cannot form the basis of a defamation claim.

In sum, none of the quotes from Keenan are capable of defamatory interpretations. Therefore, McGunigle's defamation claim will be dismissed in its entirety.

**V.      Conclusion**

For the foregoing reasons:

1.      The motion for summary judgment by defendants City of Quincy and Paul Keenan and John Dougan in their official capacities (Docket No. 65) is GRANTED.

2.      The motion for summary judgment by defendants Paul Keenan and John Dougan in their individual capacities (Docket No. 67) is GRANTED.


**So Ordered.**

                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated: September 18, 2015                           United States District Judge